IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE: : CASE NO. 10-07152 (ESL)

:

REITTER CORPORATION D/B/A :
HOSPITAL SAN GERARDO : CHAPTER 11

:

: 

Debtor :

:

OPINION AND ORDER

The issue before the court is whether Banco Popular de Puerto Rico (hereinafter referred to as "BPPR") or the United States Internal Revenue Service (hereinafter referred to as the "IRS") is the senior lien holder over Debtor's cash collateral, in particular, the Debtor's accounts receivables generated on or after March 1, 2010, in accordance with 26 U.S.C. §§6321, 6322 and 6323 (Docket Nos. 97 & 135). The IRS and BPPR have filed legal memoranda (Docket Nos. 117 & 124) regarding this particular issue and their respective replies to the same (Docket Nos. 124 & 125). Debtor has joined BPPR's legal position (Docket No. 188). For the reasons stated herein, this court finds that the IRS is the senior lien holder over Debtor's accounts receivables which were generated on or after March 1, 2010.

Facts and Procedural Background

Reitter Corporation filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code on August 6, 2010. The Debtor included the IRS in its "List of Creditors Holding 20 Largest Unsecured Claims" in the amount of $1,887,946.42. (Docket No. 23). Debtor also listed in its Schedule E, Creditors Holding Unsecured Priority Claims, the IRS' claim for taxes, interest and penalties in the amount of $1,887,946. The only secured creditor Debtor included in its Schedule D, Creditors Holding Secured Claims, was BPPR's claim for general hospital specializing, accounts receivable, equipment & fixtures and escrow account in the amount of $10,182,258.63. Debtor's Schedule A, Real Property, includes its fee simple interest in the property described as, "general hospital specializing in acute and skill nursing services located at km 0.5, State Road 844, Cupey Ward, San Juan, PR" which has a current value of $13,130,000.00 (without deducting any secured claim or

exemption) subject to a secured claim in the amount of $7,679,999.47 (Docket No. 23). Debtor in its Schedule B, Personal Property, included accounts receivables in the amount of $2,502,259.16 (Docket No. 23).

On September 8, 2010, the IRS filed proof of claim #4-1 in the amount of $2,941,703.11, of which it claims $1,380,978.52 to be secured, $459,713.61 to be unsecured, and the remainder $1,101,010.98 as an unsecured priority tax claim under 11 U.S.C. §507(a)(8). On December 10, 2010, BPPR filed a secured proof of claim #33-1 in the amount of $11,674,291.63, which is broken down in the following manner: (i) $10,155,841.48 of principal as of August 6, 2010; (ii) $84,765.37 of interest accrued up to August 6, 2010; (iii) $233,684.78 of interest accrued between August 7, 2010 and December 10, 2010; and (iv) $1,200,000.00 of liquidated damages.

On September 1, 2010, Debtor and BPPR filed an Urgent Joint Motion and Stipulation for Interim Use of Cash Collateral, Adequate Protection and for Other Relief by which BPPR allowed Debtor the interim use of certain of its cash collateral to satisfy certain necessary operating expenses until November 4, 2010. The additional adequate protection the Debtor granted BPPR for the limited use of the Cash Collateral[1] as defined in the Stipulation, amongst other things, was to grant BPPR a valid perfected post-petition super priority claim in an amount equal to any diminution of value of BPPR's interest in the Cash Collateral, resulting from Debtor's limited use of the Cash Collateral in the amounts provided in the Budget (Docket No. 28, IV. Stipulation, paragraphs 18-21). The court granted the same on September 8, 2010 (Docket No. 33). Subsequently, on October 26, 2010, BPPR and Debtor filed a Joint Motion Amending Stipulation for Interim Use of Cash Collateral, Adequate Protection and for Other Relief by which the parties requested the Court to enter an Order approving the Amendment to Stipulation retroactively (Docket No. 44). On November 8, 2010, the Court granted the request retroactively as of the date of the filing of the stipulation (Docket No. 56). On

---

[1] Cash Collateral is defined in the Stipulation as, "Debtor further acknowledges that Banco Popular is entitled to all cash, cash equivalents, rents, issues, revenues and income arising from the Property, and all profits resulting from the collection of its account receivables, in any form received, as it constitutes Banco Popular's cash collateral as defined in 11 U.S.C. §363(a) (collectively hereinafter the 'Cash Collateral')" (Docket No. 28, III. Recitals, paragraph 8).

November 4, 2010 BPPR and Debtor filed an Urgent Motion for Entry of Order Extending Stipulation, as Amended, for the interim use of Banco Popular's Cash Collateral Until December 6, 2010, by which BPPR and Debtor have agreed, on an emergency basis, to amend the Stipulation to extend all of the terms and conditions contained in the same until December 6, 2010 (Docket No. 55). On November 15, 2010 the court granted BPPR and Debtor's unopposed request for the interim use of Banco Popular's Cash Collateral until December 6, 2010 (Docket No. 58).

On December 6, 2010, the IRS filed a motion to prohibit the use of cash collateral requesting; (i) the court to enter an Order prohibiting Debtor's use of cash collateral pursuant to 11 U.S.C.§363(c)(2) and (e) and Fed. R. Bankr. P. 4001(a) due to the IRS secured creditor status pursuant to 26 U.S.C. §§6321, 6322 and 6323; (ii) the court to vacate the prior Orders (Docket Nos. 33, 56 & 58) by which it granted Debtor and BPPR's request for the use of cash collateral due to insufficient service of process of the three (3) joint motions pursuant to Fed. R. Bankr. P. 9014(b), 4001(b), 7004(b)(5), and P.R. LBR 4001-2 and; (iii) the court to order BPPR to disgorge any payments of cash collateral it has received from Debtor (Docket No. 74). On the same date, Debtor and BPPR filed an Urgent Motion for Entry of Order Extending Stipulation For the Interim Use of Banco Popular's Cash Collateral until January 4, 2011. On December 7, 2010, the court denied BPPR and Debtor's Urgent Motion for Entry of Order Extending Stipulation For the Interim Use of Banco Popular's Cash Collateral (Docket No. 75) and ordered the Debtor to reply within seven (7) days to the IRS' Motion to Prohibit the Use of Cash Collateral[2] (Docket No. 76).

On December 14, 2010, BPPR filed its Opposition to the IRS' Motion to Prohibit Use of Cash Collateral arguing the following: (i) the joint motions requesting use of cash collateral were correctly notified to the IRS in conformity with Fed. R. Bankr. P. 9014 (b), 4001(d) and P.R. LBR 4001-2; (ii) the IRS is estopped, barred and impeded by the law of the case, its own acts and estoppel doctrines

---

[2] A hearing regarding this matter was scheduled for December 28, 2010 (Docket No. 76). On December 9, 2010, Debtor, BPPR and the IRS filed an Emergency Joint Motion and Stipulation regarding the use of cash collateral from December 7, 2010 until December 28, 2010 (Docket No. 77). On December 14, 2010, the court granted the Emergency Joint Motion and Stipulation between the Debtor, BPPR and the IRS to allow Debtor to use cash collateral from December 7, 2010 until December 28, 2010 (Docket No. 80).

from objecting to the BPPR stipulations since the IRS had both actual and constructive notice of BPPR's stipulations; (iii) the IRS failed to evidence its alleged liens and security interests over Debtor's cash collateral, thus Debtor is unable to determine the date upon which the same became enforceable; (iv) BPPR's liens and security interests have priority over the IRS' alleged liens and security interest as they are first in time; (v) the IRS' liens and security interests are subordinated to BPPR's liens and security interests, thus until BPPR's claim has been fully satisfied, all of Debtor's real property and certain personal property, including cash and cash collateral may not be used to satisfy the IRS' claim or provide adequate protection; and (vi) "[a]ll of Debtor's real property and certain personal property, including cash and cash collateral, constitute proceeds from contract rights and fruits from the mortgaged property, which, respectively, constitute commercial financing security, 26 U.S.C. §6323(c)(2)(C)(i) and §6323(c)(2)(C)(iii), which were acquired by the taxpayer before the alleged filing of the NFTLs, 26 USC §6323(c)(2)(B), and which secure a commercial financing security agreement. 26 USC §6323(c)(2)(A). See also, Plymouth Savings Bank v. United States Internal Revenue Service, 187 F. 3d 203, 206-207 (1999)." (Docket No. 84). On December 24, 2010, the Debtor filed its Opposition to the IRS' Motion to Prohibit the Use of Cash Collateral by which it joined BPPR's position (Docket No. 95).

On December 28, 2010, a hearing was held regarding the IRS' motion to prohibit the use of cash collateral and the opposition by BPPR and Debtor (Docket No. 97). At the hearing the court made the following rulings: (1) IRS is a secured creditor over Debtor's cash collateral pursuant to 26 U.S.C. §6321, irrespective of which party is the senior lien holder of Debtor's accounts receivables. The IRS' proof of claim and Exhibit A (Certifications of the filing of the tax liens) are sufficient evidence and support to establish that the documents were indeed registered with the District Court; and (2) the IRS was not given due notice of the Stipulation between BPPR and Debtor in conformity with Fed. R. Bankr. P. 9014, 4001(b) and 7004(b)(5). Thus, the IRS is not bound by the Agreement (Stipulation). The court further emphasized that irrespective of whether or not the IRS is junior to BPPR or not, the IRS holds a lien over Debtor's cash collateral. Consequently, any motion or agreement entered into by BPPR and the Debtor may not affect the rights of the IRS over the cash collateral. The court found that the only pending issue remaining to be adjudicated is whether BPPR

4

or the IRS is the senior lien holder over Debtor's cash collateral (accounts receivables), as of March 1, 2010. The court ordered Debtor, BPPR and the IRS to file simultaneous briefs on or before January 14, 2011 (Docket Nos. 97 & 135). On December 29, 2010, BPPR filed its Notice of Appeal from the two rulings included in the Order entered on December 28, 2010 and its election to have said appeal heard by the District Court (Docket Nos. 98, 99 & 100).

*Parties' Legal Arguments- Priority of Liens*

On January 14, 2011, the IRS filed its legal memorandum presenting the following arguments: (i) the IRS perfected its earliest tax lien on the Debtor's personal property (cash collateral) in conformity with 26 U.S.C. §6323(f) on January 14, 2010, by properly filing notices of such federal tax liens (other notices of federal tax liens were filed on February 1, 2010 and April 20, 2010); (ii) "...under 26 U.S.C. §6323(c), Banco Popular's interest in the Debtor's cash collateral is superior to the United States' federal tax liens only if (1) the security agreement was entered into prior to the tax lien filing; (2) the loan to the Debtor was extended without Banco Popular's having prior knowledge of the United States' federal tax liens, and prior to the filing of the federal tax lien or within 45 days afterward; and (3) the Debtor acquired the cash collateral at issue within 45 days after the filing of the notice of federal tax lien. Of these elements, only the third is at issue here;" (iii) "Courts have consistently held that even in the face of a previously recorded security interest, after 45 days, the United States' federal tax liens become the senior lien over the newly acquired cash collateral;" (iv) "Debtor's latest operating report (for the period of November 2010) states that of its current accounts receivable balance of $2,678,882.27, the amount of accounts receivable aging 90 days or less was $2,164,043.54, or 80.8% of all accounts receivable (See Doc. #111 at 4). This means that at least 80.8% of the Debtor's accounts receivable were generated after March 1, 2010. Not only does the United States have a senior secured claim over all new accounts receivable from March 1, 2010, but it appears from this latest operating report that the United States has a senior secured claim over most, if not all, of the Debtor's current aging accounts receivable;" and (v) Banco Popular's reliance on Plymouth Savings Bank v. United States, 187 F. 3d 203, is misplaced because in this case the bank's secured interest was found to be senior to the IRS' tax liens over the rights acquired through the contract due to the fact that the taxpayer's contract for services was entered into during the 45 day

safe harbor period provided by 26 U.S.C. §6323. (Docket No. 116).

On January 14, 2010, BPPR filed its legal memorandum arguing the following: (i) the IRS did not file an adversary proceeding as required by Fed. R. Bankr. P. 7001(2) and (9) and 9014 to determine whether BPPR or the IRS is the senior lien holder of certain cash collateral; (ii) BPPR's liens and security interest have absolute and exclusive priority over the IRS' alleged liens and security interests because they came into existence long before the IRS' alleged liens and security interests; (iii) BPPR's secured interest in Debtor's cash collateral is evidenced by the following: (a) a mortgage deed which extends to the fruits of the encumbered real estate, including Debtor's income, revenue and profits, whether due or to become due, arising from or related to parcels 7,423 and 4,003 which constitute part of Debtor's cash collateral and various other contracts related to the mortgage deed (Docket No. 117, pgs. 16-17-list of contracts); (b) various financing statements duly filed with the Puerto Rico State Department which include the following: (1) October 2, 2001 (#2001072636), encumbering all present and future accounts receivables; (2) February 27, 2006 (#2006021009), amended April 21, 2006, encumbering all present and future contract rights and accounts receivables, among others; (3) June 7, 2007 (#2007028651), encumbering all present and future contract rights and accounts receivables, among others; and (4) December 18, 2008 (#2008029274), amended March 26, 2009, encumbering all present and future contract rights and accounts receivables, among others; (iv) BPPR's interest in Debtor's cash collateral arises from various contracts related to the mortgage deed (Docket No. 117, pg. 17-list of contracts); (v) Debtor granted BPPR an interest in its contract rights as defined in 26 C.F.R. §301.6323(c)-(1)(d), and thus, acquired the same when the contracts were executed between Debtor and the various Health Insurance Companies, which was prior to the dates the notices of federal tax liens ("NTFL") were filed (Docket No. 117, p. 22-list of contracts between Debtor and Health Insurance Companies); (vi) "... the proceeds of contract rights in which Debtor granted BPPR an interest pursuant to the Security Agreements for which the Financing Statements were filed were also in existence before the security agreements were filed, which was prior to the dates in which the NTFL's were allegedly filed;" since such proceeds are acquired on the date the contract is executed pursuant to 26 CFR §301.6323(c)- (1)(d) and Plymouth Savings Bank v. United States, 187 F. 3d at 208 (Docket No. 117, pgs. 24, 31); (vii) "[p]roceeds of Debtor's

contract rights include accounts receivables generated by Debtor's performance of services contemplated under the corresponding contracts. Plymouth Savings Bank v. United States, 187 F. 3d at 208 (Docket No. 117, p. 31);" (viii) BPRR's interest in Debtor's cash collateral became protected under local law against a subsequent judgment lien arising out of an unsecured obligation on the date in which BPPR's financing statements were duly filed; (ix) BPPR's liens and security interests fall within the safe harbor of 26 U.S.C. §6323 because they constitute commercial financing security provided before the filing of the NFTLs to secure a commercial transactions financing agreement; (x) BPPR's liens and security interests arise out of a commercial financing agreement pursuant to 26 U.S.C. §6323(c)(2)(A); and (xi) Debtor's cash collateral constitutes qualified property in conformity with 26 U.S.C. §6323(c)(2)(B) and (C) (Docket No. 117). On January 14, 2011, Debtor filed a motion whereby it joins BPPR's position its memorandum of law (Docket No. 118).

Subsequently, the IRS on January, 28, 2011 filed its reply in opposition to BPPR's memorandum of law presenting the following arguments: (i) BPPR is incorrectly interpreting Plymouth Savings Bank v. United States, 187 F. 3d 203, because it is confusing its own mortgage and financing agreements with separate and future contracts for services; (ii) in the Plymouth Savings Bank v. United States case there were two contractual agreements; (a) the first was a financing agreement between the debtor and the bank that, "'specifically granted the bank [a secured interest in]: all cash, non-cash proceeds resulting or arising from the rendering of services by Dionne; all general intangibles including proceeds of other collateral; and all inventory, receivables, contract rights or other personal property of Dionne;'" (b) the second contractual agreement was a contract for services between the debtor and a third party that was entered into before the expiration of the 45-day safe harbor, but a portion was paid much later; (iii) in Am. Inv. Fin. v. United States, 2007 U.S. App. Lexis (10th Cir.), "[t]he district and appellate courts both agreed that although a commercial transactions financing agreement (as defined under 26 U.S.C. §6323(c)(2)(A)) between the bank and the medical facility was present, the United States' tax liens had priority after 45 days because 'a right to payment arose when identifiable care was rendered to a patient, and a specific account receivable was thus created;'" and (iv) an adversary proceeding to resolve the issue as to whether BPPR or the IRS is the senior lien holder of the cash collateral is inappropriate because (1) BPPR was the party

that raised the issue of priority of the IRS' tax liens when it filed its brief on December 14, 2010 (Docket No. 84); (2) since BPPR first raised the issue of priority, the IRS was then required to inform BPPR about the applicability of the 45-day rule at the hearing held on December 29, 2010; (3) a determination as to the validity, priority or extent of a lien can come about through a variety of procedural routes other than as a result of an adversary proceeding; and (4) the commencement of an adversary proceeding would cause undue delay and would be prejudicial to the Debtor (Docket No. 124).

On January 28, 2011, BPPR filed its reply to the IRS' memorandum of law by which it argues the following: (i) BPPR liens and security interests over Debtor's cash collateral fall under the safe harbor provisions of 26 U.S.C. §6323(c) because Debtor's accounts receivables "...constitute 'qualified property' as proceeds of Debtor's Rights in Debtor's Healthcare Services Contracts (as it is the contracts with the insurance companies which give Debtor the right to submit invoices to said companies for payment) which came into existence on the date in which the Debtor entered into Debtor's Healthcare Services Contracts with the corresponding health insurance companies (all of which occurred before the Debtor entered into the BPPR Security Agreements) and therefore, BPPR's Security Interests were superior liens entitled to complete priority of the IRS' alleged Liens and Security Interests" (Docket No. 125, p. 5); (ii) the accounts receivable aging report in which the IRS relied to allege that certain accounts receivables were generated on or after March 1, 2010 does not provide the information necessary to determine when the accounts receivable came into existence since it fails to disclose on which day the Debtor acquired the right to be paid given that, "...in this case the actual date in which the right to be paid was acquired will vary according to the specific terms agreed by Debtor and the corresponding health insurance company" (Docket No. 125, pgs. 7-8); (iii) the IRS has not met its evidentiary burden since it has not submitted into evidence documents which evince the dates in which the IRS alleges the Debtor acquired the accounts receivable in question; (iv) all of Debtor's accounts receivables are proceeds of contract rights since all the customers listed in the accounts receivable aging (such as ACAA, American Health, AMPR, C.F.S.E., Cigna, First Plus, Global Health, Humana, IMC, Map[f]re, MCS, Medicare Optimo, Medicare Selecto, MMM, Option Health, Palic, PMC, Privado, Tricare, SSS, and US Border Protection) are

8

entities which entered into the Debtor's Healthcare Services Contracts with Debtor before the IRS filed the NTFLs; (v) the choateness doctrine is inapplicable to security interests as defined in 26 U.S.C. §6323 because to be protected under 26 U.S.C. §6323(a), a security interest must only meet the requirements established in the definition of an existing security interest in 26 U.S.C. §6323(h)(1), whether or not in all other regards they are definite and complete at the time notice of the tax lien is filed; (vi) even if the choateness doctrine is applicable, BPPR's liens and security interests were choate at the time of the alleged filing of the NTFLs because they satisfied the three (3) requirements under the choateness doctrine; (vii) Section 6323(a) of the IRC is the only section which applies to security interests that came into existence before the filing of a notice of federal tax lien and does not contain any 45 day limitation as further explained by 26 C.F.R. §301.6323(a); (viii) Sections 6323(c) and (d) of the IRC are inapplicable to security interests that existed prior to the date in which the NFTLs were filed by the IRS; (ix) BPPR's liens and security interests satisfy all the requirements of 26 U.S.C. §6323(h), which establish whether a security interest was in existence at the time the NFTLs were filed; (x) the Tenth Circuit's holding in Am. Inv. Fin. v. United States., 476 F. 3d 810, is inapplicable in this case; and (xi) "[i]t is the public interest for the courts to recognize the priority of holders of previously existing security interests in accounts receivable, proceeds of contracts rights and/or mortgaged property composed of the fruits of mortgaged real estate, including the income, revenue and profits thereof" (Docket No. 125).

Applicable Law & Analysis

The Federal Tax Lien Act of 1966, as amended (the "FTLA"), 26 U.S.C. §§6321-6326, provides for a federal tax lien to be created in favor of the United States Federal Government against any taxpayer who fails to pay federal taxes. 26 U.S.C. §6321[3]. This tax lien encumbers, "...all property and rights to property, whether real or personal, belonging to such person." Id. The FTLA also

---

[3] Section 6321 of the IRC provides, ""[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. §6321.

establishes the rights of private creditors with respect to a federal tax lien. 26 U.S.C. §§ 6321-6326. The federal tax lien is created upon the IRS' assessment and remains until such tax liability is satisfied or the same becomes unenforceable due to lapse of time. 26 U.S.C. §6322[4]. However, for federal liens to be valid against holders of a security interest, notice of such liens must be filed in conformity with state recordation law. 26 U.S.C. 6323(a) and (f).[5] The nature of the legal interest which the taxpayer holds in the property is established by state law but federal law dictates the priority of competing liens asserted against the taxpayer's property (cash collateral, particularly accounts receivables) or rights to property (contract rights, specifically rights to the Healthcare Services Contracts). See Aquilino v. United States, 363 U.S. 509, 513-14, 4 L. Ed. 2d 1365, 80 S. Ct. 1277 (1960); Rodriguez v. Escambron Dev. Corp, 740 F. 2d 92, (1st Cir. 1984)("A federal tax lien is wholly a creature of federal law. It is one of the 'formidable arsenal of collection tools' necessary 'to ensure the prompt and certain enforcement of the tax laws in a system relying primarily on self reporting.' United States v. Rodgers, 461 U.S. 677, 103 S. Ct. 2132, 2137, 76 L. Ed. 2d 236 (1983). Accordingly, the effects, priority, enforcement, and extinguishment of a tax lien are federal concerns. The Internal Revenue Code 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.' United States v. Bess, 357 U.S. 51, 55, 78 S. Ct. 1054, 2 L. Ed. 2d 1135(1958).").

The FTLA altered to a certain extent the common-law principles that first in time is first in right, and establishes that federal tax liens are superior to inchoate liens by incorporating 26 U.S.C. § 6323(c) and affording certain commercial transactions financing agreements with a 45 day safe

---

[4] Section 6322 of the IRC provides, ""[u]nless another date is specifically fixed by law, the lien imposed by section 6321shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C. §6322.

[5] Section 6323(a) provides: "[p]urchasers, holders of security interests, mechanic's lienors, and judgment lien creditors.– The lien imposed by section 6321 shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary." 26 U.S.C. §6323(a).

harbor period. See Bremen Bank & Trust Co. v. United States, 131 F. 3d 1259, 1263 (8th Cir. 1997); Rodriguez v. Escambron Dev. Corp, 740 F. 2d at 97 fn. 7 ("The Tax Lien Act does not, however, provide for every type of lien, and choateness continues to be a consideration in tax lien cases"); J.D. Court, Inc. v. United States, 712 F. 2d 258, 263 (7th Cir. 1983). "An interest is choate when 'there is nothing more to be done to have a choate lien– when the identity of the lienor, the property subject to the lien, and the amount of the lien are established'" Rodriguez v. Escambron Dev. Corp, 740 F. 2d at 98 citing United States v. Pioneer American Insurance Co., 374 U.S. 84, 89, 83 S. Ct. 1651, 10 L. Ed. 2d 770 (1963). Notwithstanding, the FTLA did not eliminate the choateness doctrine since the same is incorporated in 26 U.S.C. § 6323(h) which defines the term "security interest" for purposes of 26 U.S.C. §§ 6323 and 6324. The term "security interest" means;

> "...any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth." 26 U.S.C. §6323(h).

Section 6323(c)[6] of the IRC provides certain commercial transactions financing agreements priority over federal tax liens subject to satisfying the following requirements; (1) the security interest must be in "qualified property;" (2) this "qualified property" must be covered by the terms of a written agreement entered into before the federal tax lien filing; (3) this written agreement must constitute a commercial transactions financing agreement ("CTFA"); and (4) the security interest must be

---

[6]Section 6323(c) provides;
> "(1) In general.– To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which–
> (A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting–
> (i) a commercial transactions financing agreement, or
> (ii) a real property construction or improvement financing agreement, or
> (iii) an obligatory disbursement agreement, and
> (B) is protected by local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation." 26 U.S.C. §6323(c)(1).

protected under state law against a judgment out of an unsecured obligation. 26 U.S.C. §6323(c).  A

CTFA is defined as,

> "an agreement (entered into by a person in the course of his trade or business)--
> (i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or
> (ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;
> but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing." 26 U.S.C. §6323(c)(2)(A).

Thus, a CTFA pursuant to Section 6323(c)(2)(A) must be executed prior to or within 45 days of the federal tax lien filing or before the lender had actual knowledge of the tax lien filing (if this is earlier than 45 days). A CTFA secured by "commercial financing security" is considered "qualified property" if the same consists of the following; (i) paper of a kind ordinarily arising in commercial transactions; (ii) accounts receivable; (iii) mortgages on real property; and (iv) inventory. 26 U.S.C. §6323(c)(2)(C). Treasury Regulations clarify that the term "paper of a kind ordinarily arising in commercial transactions" under Section 6323(c)(2)(C)(i) includes written documents which give contract rights such as chattel paper, documents of title to personal property, and negotiable instruments or securities. 26 C.F.R. §301.6323(c)-(1)(c). The Treasury Regulations define the term "contract rights" under Section 6323(c) as, "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper." 26 C.F.R. §301.6323(c)-(1)(c)(2)(i). A contract right is acquired by the taxpayer when the contract is made. The Treasury Regulations also define the term "accounts receivable under Section 6323(c) as, "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." 26 C.F.R. §301.6323(c)-(1)(c)(2)(ii). Accounts receivables are, "...acquired by the taxpayer at the time, and to the extent, a right to payment is earned by performance. 26 C.F.R. §301.6323(c)(1)-(d). The Treasury Regulations provide that, "[i]dentifiable proceeds, which arise from the collection or disposition of qualified property by the taxpayer, are considered to be acquired at the time such qualified property is acquired if the secured party has a continuously perfected security in the proceeds under local law. The term "proceeds" includes whatever is received when

12

collateral is sold, exchanged, or collected." Id. Thus, if the "qualified property" (collateral) is a contract right, the proceeds generated from those rights are acquired by the taxpayer at the time the contract is made. See Plymouth Savings Bank v. United States, 187 F. 3d 203, 208; Am. Inv. Fin. v. United States, 2007 U.S. App. Lexis 20512. However, if the "qualified property" is comprised of accounts receivables, then the proceeds are acquired when the service is performed.

The IRS concedes that BPPR's security agreement was entered prior to the tax lien filing and that the loan to the Debtor was extended without BPPR having knowledge of the IRS' tax liens, and prior to the filing of the federal tax lien or within 45 days afterward. The only pending issue in the instant case is whether the Debtor acquired the cash collateral within 45 days after the filing of the notice of the federal tax lien. This issue hinges upon whether the cash collateral ("qualified property"), namely, the accounts receivables (generated on or after March 1, 2010), constitute "contract rights" or "accounts receivables" which originated from BPPR's secured interest in the mortgage deed which extends to the fruits of the mortgaged parcels (including Debtor's income, revenue and profits) and from the financing statements duly filed with the Puerto Rico Department of State which provided BPPR a secured interest in Debtor's present and future contract rights (Debtor's Healthcare Services Contracts with various health insurance companies) as well as in its accounts receivables. The difficulty in categorizing the "qualified property" is that accounts receivables may constitute the proceeds of contract rights. See State Bank of Fraser, 861 F. 2d 954, 965 (6th Cir. 1988).

Section 2006 of the Puerto Rico Commercial Transactions Act defines the term "account" as, "... any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance;" and the term "general intangibles" is defined as, "... any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, investment property, rights to proceeds of written letters of credit, and money. All rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are accounts." 19 L.P.R.A. §2006. Pursuant to these definitions, the court finds that the healthcare insurance receivables fall under the term "accounts" pursuant to the Puerto Rico Commercial

13

Transactions Act because the accounts receivables are generated for healthcare services which have been rendered by Debtor. The contract rights fall under the term "general intangibles" because the same are defined as any personal property, which specifically exclude accounts.

This court agrees with the Tenth Circuit's analysis in <u>Am. Inv. Fin. v. United States</u>, 476 F. 3d 810, regarding the characterization (categorization) of whether the accounts receivables generated by provider contracts which were executed between the taxpayer (Nightime Pediatrics Clinics, Inc.) and various insurance companies prior to the filing of the federal tax liens constituted "accounts receivables" or "contract rights" pursuant to 26 U.S.C. §6323(c) and C.F.R. 301.6323(c)-(1)(c)(2)(i) and (ii) and 301.6323(c)-(1)(d). The Tenth Circuit's analysis of the characterization of the cash collateral (accounts receivables) is based on the contractual provisions of the provider contracts, particularly focusing on the following elements: (a) the provider contracts did not guarantee a definite right to payment prior to the performance of service; (b) the provider contracts ensured a certain rate of reimbursement that the insurance company would pay Nightime Pediatrics Clinics, Inc.(hereinafter referred to as the "Clinic") if certain conditions were satisfied; (c) the provider contracts did not guarantee that the Clinic would receive payment, given that it was not certain whether qualifying patients would come to the Clinic for services that would entitle it to payment; (d) no capitation clauses were in place that would guarantee a certain level of payment regardless of whether any covered patients came to the Clinic; (e) the right to payment in the provider contracts hinged upon the actions of third parties, namely the Clinic's performance of services for patients; (f) the Clinic has no enforceable payment rights under the provider contracts until a covered patient came into the Clinic, generated an account receivable and the insurance company was billed; and (g) the provider contracts did not list specific services that the Clinic was required to complete at some point in the future, nor do the contracts specify payments that the insurance companies were required to make at some point in time. <u>Am. Inv. Fin. v. United States</u>, 476, F. 3d 810, 815-816.

In the instant case, the court finds that the key element which differentiates whether the accounts receivables in controversy are "contract rights" or "accounts receivables" is simply that the health care insurance receivables are generated upon the rendering of services by the Debtor to an unrelated third party (patients) not privy to the contract, rather than arising directly from the provider

14

contract. Note-2, Summary of Significant Accounting Policies, of the audited balance sheet, related statement of operations and deficit and cash flows for the year ended as of June 30, 2009 discloses the following regarding the organization and nature of operations: "Reitter, Corp. D/B/A Hospital San Gerardo is a domestic corporation organized under the laws of the Commonwealth of Puerto Rico, to operate a health care institution in the San Juan Municipality. A large part of hospital services are for patients whose bills are paid in whole or in part by third-party payors, such as Medicare, Blue Cross, SSS and other private insurance carriers." (Docket No. 151, Exhibit H). Note 3- Net Patient Service Revenue of the Financial Statements, disclose the following; "The Hospital has agreements with third-party payors that provide for reimbursement to the Hospital at amounts different from its established rates. Contractual adjustments under third-party reimbursement programs represent the difference between the Hospital's established rates for services and amounts reimbursed by third-payors."[7] (Docket No. 151, Exhibit H).

This court also agrees with the Tenth Circuit's analysis in <u>Am. Inv. Fin. v. United States</u>, 476

---

[7] The remaining portion of Note 3- Net Patient Service Revenue reads as follows: "A summary of the basis with mayor third-party payor follows:

<u>Medicare</u>
Inpatient acute care services rendered to Medicare program beneficiaries are paid at prospectively determined rates per discharge. These rates vary according to a patient classification system that is based on clinical, diagnostic, and other factors. Inpatient non-acute services, outpatient services, and defined capital cost related to Medicare beneficiaries are paid based upon a cost reimbursement methodology. The Hospital is reimbursed for cost reimbursable items at a tentative rate with final settlement determined after submission of an annual cost report by the Hospital and an audit by the Medicare fiscal intermediary. The hospital's medicare cost reports have been audited by a medicare fiscal intermediary through year 2007, the cost report for year ended June 30, 2009, is subject to the medicare fiscal intermediary examination.

<u>SSS, Blue Cross, ACAA</u>
Inpatient and outpatient services rendered to subscribers are reimbursed at an all-inclusive per diem rate. The prospectively determined per diem rates are not subject to retroactive adjustment. The Hospital has also entered into reimbursement agreements with certain commercial insurance carriers, health maintenance organization, and preferred provider organizations. The basis for reimbursement under these agreements includes prospectively determined rates per discharge, discounts from established charges, and prospectively determined per diem rates." (Docket No. 151, Exhibit H).

F. 3d 810 regarding certain pivotal differences between the provider contracts in the instant case and the type of contract which was at play in Plymouth Savings Bank v. United States, 187 F. 3d 203. The Tenth Circuit analysis in Am. Inv. Fin. v. United States, 476 F. 3d at 816 is based on whether the contract involved is between a taxpayer and another party, where the taxpayer was to perform a specified service for that party in exchange for a specified payment. The Tenth Circuit notes that, "Plymouth, for example, involved a contract between a taxpayer and a hospital. The taxpayer was to help the hospital to obtain a license, and in return the hospital was to pay the taxpayer $300,000 in several installments. At the time the IRS filed a lien in that case, the taxpayer had not yet obtained the license for the hospital, and she did not procure the license within the 45-day safe harbor. See Plymouth, 187 F. 3d at 206. However, she had been paid two installments, and was awaiting the final balance. The Plymouth court held that the taxpayer obtained a contract right to be paid for the work she agreed to do, and that the money paid to her resulted from that contract right. Thus, because the contract had been entered into before the expiration of the safe harbor, the private security interest in that case prevailed over the federal tax lien." Am. Inv. Fin. v. United States, 476 F. 3d at 816.

BPPR argues that the accounts receivable aging report in which the IRS relied on to allege that certain accounts receivables were generated on or after March 1, 2010 does not provide the information necessary to determine when the accounts receivable came into existence since it fails to disclose on which day the Debtor acquired the right to be paid alleging that, "...in this case the actual date in which the right to be paid was acquired will vary according to the specific terms agreed by Debtor and the corresponding health insurance company" (Docket No. 125, pgs. 7-8). The court finds this allegation to be unsound and contrary to U.S. Generally Accepted Accounting Principles and the Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, issued by the Financial Accounting Standards Board which establish the basis for accrual accounting. Under accrual accounting, revenue is recognized when it is earned and when it is realized or realizable. Revenue is earned when products are delivered or services are provided. Revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. Realized means cash is received, and realizable means that it is reasonable to expect that cash will

16

be received in the future.[8] Thus, in the instant case when services are provided by the Debtor hospital to patients, the account receivables account should be debited and revenue recognized by crediting a service revenue account. Once the cash is received, then the account receivable is credited and the cash received is debited. Note 2, Summary of Significant Accounting Policies, included as part of the audited balance sheet, related statement of operations and deficit and cash flows for the year ended as of June 30, 2009 disclose the following regarding Patient Accounts Receivable: "[p]atient accounts receivable are presented net of the allowance for doubtful accounts. The Company provides an allowance for doubtful collections based upon a review of outstanding receivables, historical collection information, and existing economic conditions. Receivables past due more than 1 year are considered doubtful. Doubtful receivables are written off based on individual credit evaluation and specific circumstances of the patient and third party payors." (Docket No. 151, Exhibit H). At the end of the day, the account receivable may not be considered a current asset of the Debtor if the same has not earned (or rendered the services) the patient service revenue associated with that account

---

[8] "Revenue recognition-general guidelines. In terms of currently enforceable guidance, under long-established GAAP, revenue, whether from the sale of product or provision of services, is to be recognized only when it has been earned. According to CON 5, *Recognition and Measurement in Financial Statements of Business Enterprises*,

...(a)n entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

In other words, in order to be recognized revenue must be realized or realizable, and it must have been earned. CON 5 notes that 'the two conditions (being realized or realizable, and being earned) are usually met by the time product or merchandise is deliver or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales or other assets are commonly recognized at time of sale (usually meaning delivery).' Moreover, 'if services are rendered or rights to use assets extend continuously over time (for example, interest or rent), reliable measures based on contractual prices established in advance are commonly available, and revenues may be recognized as earned as time passes.' In other words, for most traditional and familiar types of transactions, the point at which it is appropriate to recognize revenue will be quite clear." Barry J. Epstein, Ralph Nach & Steven M. Bragg, Wiley GAAP 2010, Interpretation and Application of Generally Accepted Accounting Principles: Evolving Principles And Specialized Applications, p. 378 (2010).

17

receivable. The insurance providers contracts guarantee the payment on the accounts receivables generated by the services rendered by the medical provider (the Debtor). The right to payment accrued when the services were rendered and not when the contracts were granted.

Lastly, BPPR and Debtor argue that the issue of lien priority over certain cash collateral (account receivables) must be brought by way of adversary proceeding pursuant to Fed. R. Bankr. P. 7001(2) and (9) and 9014. The court notes that the issue of lien priority was first raised by BPPR in its Opposition to the IRS' Motion to Prohibit Use of Cash Collateral (Docket No. 84, pgs. 16-17) and further discussed at the December 28, 2010 hearing (Docket Nos. 97 & 135). BPPR failed to follow the appropriate procedural mechanism established in Fed. R. Bankr. P. 7001(2) to determine the priority of a lien or other interest in property, and may not at this juncture demand from the IRS a procedural vehicle it did not follow. There are no critical facts in dispute. The issue hinges on applicable law. In any event, the court for the sake of expediency and judicial economy, will entertain the issue of lien priority as a contested matter pursuant to Fed. R. Bankr. P. 9014.

Conclusion

In view of the foregoing, the court finds that Debtor's health insurance accounts receivables are a collateral categorized as an account and not a general intangible under the Puerto Rico Commercial Transactions Act, 19 L.P.R.A. §2006, Section 6323(c) of the IRC, 26 U.S.C. §6323(c) and pertinent regulations. Thus, the IRS is the senior lien holder over Debtor's accounts receivables which were generated on or after March 1, 2010.

SO ORDERED.

In San Juan, Puerto Rico, this 13th day of May 2011.

Enrique S. Lamoutte
United States Bankruptcy Court